## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

---

GOLDWAVE INC.
2 Third Street, Mt. Pearl, NFLD Canada A1N 2A5,          Case No:

        Plaintiff,

    v.

BOSE CORP.
The Mountain, Framingham, Massachusetts 01701-9168,

        Defendant.

---

### COMPLAINT

The Plaintiff, GoldWave Inc. asserts the following as its Complaint against the Defendant, Bose Corp.

### Nature of Action

1.      This is an action under 15 U.S.C. §1071(b) seeking judicial review and reversal of the final decision of the Trademark Trial and Appeal Board ("TTAB") of the United States Patent and Trademark Office ("PTO") in trademark Opposition No. 91165449 (attached hereto as **Exhibit 1**), sustaining the opposition and refusing to register Plaintiff's U.S. Trademark Application Serial No. 78413775, for the mark GOLDWAVE, for computer software for audio editing.

### Parties

2.      Plaintiff, GoldWave Inc. ("GoldWave"), is a corporation organized and existing under the laws of Canada, whose address is P.O. Box 51, St. Johns, NFLD Canada AIC 5H5.

3.    Upon information and belief, Defendant Bose Corp. ("Bose"), is a corporation, organized and existing under the laws of Delaware, with an address of The Mountain, Framingham, Massachusetts 01701-9168.

### Jurisdiction and Venue

4.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. §1071(b); and 28 U.S.C. §1331.

5.    This Court has personal jurisdiction over Bose because Bose has purposely availed itself of the privileges and benefits of doing business in the District of Columbia by engaging in business, by having a continuing corporate presence directed toward advancing Bose's objectives, and/or by engaging in a systematic course of conduct in this District.

6.    Venue in this judicial district is proper under 28 U.S.C. §§1391(b) and (c).

### Background and Facts

7.    GoldWave develops professional quality, digital audio editing software and multitrack audio/video mixing software. In April 1993, GoldWave released the GoldWave Digital Audio Editor software, including in the United States, and since that date, Plaintiff GoldWave has continuously used the GOLDWAVE mark in commerce, to identify its audio editing software. Since the first release of the GOLDWAVE audio editing software, the program has continued and is considered one of the best available today.

8.    Since its initial release, Plaintiff's GOLDWAVE software has achieved enormous success and recognition. The GOLDWAVE audio editing software is downloaded over one million (1,000,000) times, per year, and has been among the most popular downloadable Windows products, including on the well known CNET and Simtel web sites. In the last decade, the GoldWave web site – where the GOLDWAVE software may be downloaded for trial, or

2

purchased – has been accessed more than ten million (10,000,000) times. The GOLDWAVE audio editing software has been the subject of numerous computing publications, as well as online publications and reviews. A substantial portion of GoldWave's sales of the GOLDWAVE audio editing software are, and have been, to customers in the United States, including the U.S. Department of Justice, the FBI, the U.S. Coast Guard, and other United States government agencies, educational institutions and research facilities.

9.    Shortly before the development and first release of the GOLDWAVE audio editing software, IBM and Microsoft developed a standard for storing studio files on a computer. That standard became known as the RIFF **wave** standard; since that time, PC (personal computers using the Windows operating software) files containing audio have been widely referred to as "wave (or .wav) files." The wave file format – which is the Windows native file format for storing digital audio data – is a widely supported PC file format.

10.    On information and belief, prior to the first use in commerce by GoldWave of its GOLDWAVE mark for audio editing software, the only product sold by Bose in the United States using "wave" as part of a trademark, was a compact "one box" transportable stereo system sold under the designation, ACOUSTIC WAVE. Prior to April, 1993, Bose's only United States Trademark Registration for the ACOUSTIC WAVE mark was a Supplemental Register registration, for "loudspeakers."

11.    In the entire fifteen (15) year period in which GoldWave has distributed and sold substantial numbers of its GOLDWAVE audio editing software in commerce, Plaintiff has not encountered a single instance of actual confusion with Defendant Bose, and/or any of the products of Defendant Bose. On information and belief, Defendant Bose has not encountered

any significant actual confusion of its company, and/or products with Plaintiff GoldWave, and/or its GOLDWAVE audio editing software.

12.    On May 5, 2004, GoldWave filed an application for U.S. trademark registration of its GOLDWAVE mark.    The application was designated Serial No. 78413775 (the "Application"), and was published in the Trademark *Official Gazette* of April 12, 2005, identifying the goods as "computer software for audio editing."

13.    On June 6, 2005, Bose filed an opposition to the Application, claiming priority of rights in the trademarks WAVE, ACUSTIC WAVE, WAVESYNC and WAVE/PC (hereafter sometimes collectively, Bose's "pleaded marks"), U.S. trademark registrations therefore, and asserting that Plaintiff's GOLDWAVE mark, as used for audio editing software, was likely to cause confusion vis-à-vis Bose and its pleaded marks as used in connection with the goods of Bose.    Said opposition was designated No. 91165449 (the "Opposition").    Goldwave answered the Opposition, denying its claims and asserting defenses, *inter alia*, of laches, waiver and estoppel.

14.    Following discovery, trial, post trial briefing, and an oral hearing, the TTAB issued a decision in the Opposition on February 25, 2008, holding that: Bose's U.S. Trademark Registrations Nos. 1,633,789 (for WAVE, for radios, clock radios, compact stereo systems and portable compact disc players), 1,338,571 (for ACOUSTIC WAVE, for loudspeakers), and 1,764,183 (for ACOUSTIC WAVE, for loudspeaker systems and music systems consisting of a loudspeaker system and amplifier and at least one of a radio tuner, compact disc player and audio tape player) accorded it priority of rights vis-à-vis GoldWave's use of the GOLDWAVE mark for audio editing software; and contemporaneous use by GoldWave of the GOLDWAVE mark in connection with Plaintiff's computer software for audio editing is likely to cause confusion with

4

Bose's use of ACOUSTIC WAVE for loudspeaker systems and music systems consisting of a loudspeaker system and amplifier and at least one of a radio tuner, compact disc player and audio tape player, and WAVE for "*inter alia*" radios, clock radios, . . . compact stereo systems and portable compact disc players. The TTAB sustained the Opposition and refused registration of the GoldWave Application.

### Count I – Appeal of TTAB Order

15.     GoldWave repeats and realleges the allegations of ¶¶1 through 14, inclusive of this Complaint, and hereby incorporates same as if fully set forth herein.

16.     The TTAB's February 25, 2008 decision and determination, sustaining the Opposition and refusing registration of the Application, is a final decision subject to review and reversal by this Court, pursuant to 15 U.S.C. §1071(b).

17.     GoldWave seeks review and reversal of the TTAB's decision on the following grounds:

> A.     The TTAB's decision that Bose's registrations nos. 1,633,789, for radios, clock radios, compact stereo systems and portable compact disc players; 1,338,571, for loudspeakers; and 1,764,183, for loudspeaker systems and music systems consisting of a loudspeaker system and amplifier and at least one of a radio tuner, compact disc player and audio tape player, accorded Bose priority of rights vis-à-vis GoldWave's intervening use of the GOLDWAVE mark in the different product category of audio editing software, is contrary to law and is not supported by substantial evidence in the record.

B.    The TTAB's refusal to give any weight to the parties' fourteen years of concurrent use of their respective marks without a single instance of actual confusion is contrary to law and is not supported by substantial evidence in the record, in particular:

    i)    The record demonstrates that there has been long, appreciable and continuous use by Goldwave of the GOLDWAVE mark in the same market(s) as those served by Bose under its marks; and

    ii)    Goldwave has additional evidence to submit to this Court that was not presented to the TTAB which shows the strong probative weight of the absence of any actual confusion on the issue of likelihood of confusion.

C.    The TTAB's finding that Bose's marks are "famous" is contrary to law and is not supported by substantial evidence in the record, in particular:

    i)    The TTAB's failure to consider the issue of fame at the time that Goldwave commenced use of its GOLDWAVE mark was contrary to law; and

    ii)    There is no evidence in the record to support a finding that Bose's marks were famous, strong, or even distinctive as of the date that Goldwave commenced use of its mark.

D.    The TTAB's finding that the marks at issue are substantially similar in overall sound, appearance, connotation and commercial impression is contrary to law and is not supported by substantial evidence in the record, in particular:

    i)      The TTAB's refusal to find and/or recognize the descriptive significance and common use of the term "wave" as to GoldWave's audio editing software was contrary to law and was not supported by substantial evidence; and

    ii)     Goldwave has additional evidence to submit to this Court that was not presented to the TTAB which supports GoldWave's claims regarding the significance, consumer perceptions, and/or commercial impression of "wave" as used for Plaintiff's GOLDWAVE audio editing software.

E.    The TTAB's findings that the respective products of Bose and Goldwave are similar, complementary and/or related, and/or are sold in the same channels of trade to the same customers, are contrary to law and unsupported by substantial evidence in the record.

F.    The TTAB's holding that the contemporaneous use by GoldWave of the GOLDWAVE mark in connection with Plaintiff's computer software for audio editing is likely to cause confusion with Bose's use of ACOUSTIC WAVE for loudspeaker systems and music systems consisting of a loudspeaker system and amplifier and at least one of a radio tuner, compact disc player and audio tape player, and WAVE for "*inter alia*" radios, clock radios, . . . compact stereo systems and portable compact disc players, is contrary to law and is not supported by substantial evidence in the record.

18.    The findings of fact in the TTAB's February 25, 2008 decision are not supported by substantial evidence, and the TTAB's conclusions of law in that decision are contrary to law.

19.    A *de novo* review of the record before the TTAB and additional evidence to be submitted herein will show that Bose has failed to meet its burden of establishing priority and/or a likelihood of confusion with respect to the GOLDWAVE mark as used by GoldWave for audio editing software, and the WAVE and/or ACOUSTIC WAVE mark for the goods set forth in Bose's pleaded registrations for those marks.

## **Prayer for Relief**

WHEREFORE, Plaintiff GoldWave Inc. requests that:

A.    Judgment be entered herein in favor of Plaintiff and against Defendant Bose Corp., on Plaintiff's Count I of this Complaint;

B.    The Court reverse and vacate the February 25, 2008 decision of the TTAB in Bose Corp. v. Goldwave Inc., Opposition No. 91165449, to the extent adverse to Plaintiff;

C.    The Court direct the Commissioner of Trademarks to issue a U.S. Trademark registration on Plaintiff's Application Serial No. 78413775;

D.    The Court declare that no rights of Bose Corp. in its asserted WAVE and/or ACCOUSTIC WAVE marks are violated or infringed by the use and/or registration by Plaintiff of its GOLDWAVE mark for audio editing software; and

E.     The Court grant such other and further relief as it deems appropriate.

JACOBSON HOLMAN PLLC

Dated: April 25, 2008                By: _____
                                         Marsha G. Gentner (D.C. Bar No. 251405)
                                         Philip O'Neill (D.C. Bar No. 941823)
                                         400 Seventh Street, N.W., 6th Floor
                                         Washington, DC  20004
                                         Telephone:  (202) 638-6666
                                         Facsimile:  (202) 393-5350
                                         mgentner@jhip.com
                                         poneill@jhip.com

                                         Attorneys for Plaintiff GoldWave Inc.

# EXHIBIT 1

Oral Hearing:
October 24, 2007

```
THIS OPINION IS
NOT A PRECEDENT
OF THE TTAB
```

*Decision Mailed:*
*February 25, 2008*
GDH/gdh

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

Bose Corp.
v.
GoldWave Inc.
_____

Opposition No. 91165449 to application Serial No. 78413775
filed on May 5, 2004
_____

Amy L. Brosius, Charles Hieken and Cynthia Johnson Walden of Fish
& Richardson P.C. for Bose Corp.

Marsha G. Gentner of Jacobson Holman PLLC for GoldWave Inc.
_____

Before Hohein, Taylor and Mermelstein, Administrative Trademark
Judges.

Opinion by Hohein, Administrative Trademark Judge:

     GoldWave Inc. has filed an application to register the

mark "GoldWave" in standard character form on the Principal

Register for "computer software for audio editing" in

International Class 9.[1]

     Bose Corp. has opposed registration on the ground that

it is the owner of valid and subsisting registrations for the

_____

[1] Ser. No. 781413775, filed on May 5, 2004, which is based on an
allegation of a date of first use anywhere and in commerce of May 1,
1993.

Opposition No. 91165449

following marks and goods which it "uses and/or has used, since long prior to May 1, 1993":

> (i) the mark "WAVE," which is registered for "radios, clock radios, audio tape recorders and players, portable radio and cassette recorder combinations, compact stereo systems and portable compact disc players" in International Class 9;[2]
>
> (ii) the mark "ACOUSTIC WAVE," which is registered for "loudspeaker systems" in International Class 9[3] and "loudspeaker systems and music systems consisting of a loudspeaker system and amplifier and at least one of a radio tuner, compact disc player and audio tape player" in International Class 9;[4]
>
> (iii) the mark "WAVESYNC," which is registered for "radio controllers, namely, controllers for remotely establishing predetermined settings in radios in rooms having occupants frequently changed, such as hotel rooms, sold through channels including those selling to renters of such rooms, such as hotels for the purpose of clearing settings in radios set by occupants who have vacated the rooms" in International Class 9;[5] and

---

[2] Reg. No. 1,633,789, issued on the Principal Register on February 5, 1991, which sets forth a date of first use anywhere and in commerce of September 25, 1989; renewed. However, in accordance with TBMP §704.03(b)(1)(A) (2d ed. rev. 2004), it is noted that on January 3, 2008, opposer filed a request pursuant to Section 7(e) of the Trademark Act to amend the registration to restrict the goods identified therein to: "radios, clock radios, compact stereo systems and portable compact disc players."

[3] Reg. No. 1,338,571, issued on the Supplemental Register, on May 28, 1985, which sets forth a date of first use anywhere and in commerce of February 1, 1984; renewed.

[4] Reg. No. 1,764,183, issued on the Principal Register, under the provisions of Section 2(f) of the Trademark Act, on April 13, 1993, which sets forth a date of first use anywhere and in commerce of February 1, 1984; renewed.

[5] Reg. No. 2,493,186, issued on the Principal Register on September 25, 2001, which sets forth a date of first use anywhere and in commerce of September 1999; affidavit §8 filed.

> (iv) the mark "WAVE/PC," which is
> registered for a "sound reproducing system
> comprised of a radio, electronic interface
> for coupling the radio to a computer, and
> computer software for controlling the signal
> transmission between the radio and the
> computer" in International Class 9;[6]

and that applicant's "GOLDWAVE mark, as applied to '[c]omputer

software for audio editing[,]' so resembles the previously used

and registered WAVE, ACOUSTIC WAVE, WAVESYNC and WAVE/PC marks of

Opposer, as used in connection with Opposer's goods, as to be

likely to cause confusion or cause mistake, or to deceive."

Applicant, in its answer, has admitted that, as shown

by the certified copies thereof which accompany the opposition,

opposer is the owner of its pleaded registrations and that such

registrations are valid and subsisting. Applicant has denied,

however, the remaining salient allegations of the opposition.[7]

The record consists of the pleadings, including the

above-noted certified copies of opposer's pleaded registrations;

the file of the involved application; the testimony with exhibits

of opposer's Category Business Manager for its "WAVE" product

line, Mr. Santiago Carvajal; and the testimony with exhibits of

applicant's president, Mr. Christopher Craig. While only opposer

---

[6] Reg. No. 2,552,385, issued on the Principal Register on March 26, 2002, which sets forth a date of first use anywhere and in commerce of November 9, 2000.

[7] While, under the rubric of "AFFIRMATIVE DEFENSES," applicant has also pleaded that the opposition "fails to state a claim upon which relief can be granted" and "is barred by the doctrines of laches, waiver and/or estoppel," no further consideration will be given to such allegations inasmuch as they are not only insufficiently pleaded but, in any event, are lacking in any evidentiary support in the record.

3

filed a brief, both parties were represented by counsel at the
oral hearing.

     With the exception of its "WAVE/PC" mark, priority of
use is not in issue in this proceeding since, as shown by the
certified copies of opposer's pleaded registrations on the
Principal Register for its other three marks and as admitted by
applicant in its answer, such registrations are subsisting and
owned by opposer.  See King Candy Co. v. Eunice King's Kitchen,
Inc., 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).  Opposer's
ownership thereof, moreover, serves to establish its standing to
bring this proceeding.  Id.

     However, as to opposer's "WAVE/PC" mark, while its
pleaded registration on the Principal Register for such mark,
based upon the certified copy thereof and as admitted by
applicant in its answer, is likewise shown to be subsisting and
owned by opposer, the prima facie presumptions otherwise afforded
the registration[8] have been rebutted inasmuch as the following
testimony of opposer's witness on cross-examination conclusively
establishes, as of the August 18, 2006 date of his deposition, a
prima facie case of opposer's abandonment[9] of the "WAVE/PC" mark:

---

[8] Under Section 7(b) of the Trademark Act, "[a] certificate of
registration of a mark upon the principal register ... shall be prima
facie evidence of the validity of the registered mark and of the
registration of the mark, of the registrant's ownership of the mark,
and of the registrant's exclusive right to use the registered mark in
commerce on or in connection with the goods or services specified in
the certificate, subject to any conditions or limitations stated in
the certificate."

[9] Section 45 of the Trademark Act defines "abandonment of mark" in
relevant part as follows (emphasis added):

     A mark shall be deemed to be "abandoned" if ... the
     following occurs:

4

Opposition No. 91165449

> Q.   Now, Mr. Carvajal, are the Wave/PC devices sold in the U.S.?
>
> A.   Currently?
>
> Q.   Yes.
>
> A.   No.  We don't sell that product at this time.
>
> Q.   Again, you said it is not sold any longer at this time?
>
> A.   That is correct.
>
> Q.   Since when was it no longer sold in the U.S. marketplace?
>
> A.   We discontinued the product in 2002.
>
> Q.   And when was the Wave/PC product last manufactured for market consumption by Bose Corporation?
>
> A.   Also 2002.

(Carvajal Dep. at 60-61.)  In view thereof, we have given no evidentiary value to opposer's pleaded registration for its "WAVE/PC" mark and have given no further consideration to such mark with respect to the claim of priority of use and likelihood of confusion.  See, e.g., Reed Tool Co. v. Litton Industrial Products, Inc., 225 USPQ 880, 881 (TTAB 1985) ["[s]ince opposer's testimony reveals that opposer is no longer making or selling these products, ... the prima facie presumption of use of the mark on these goods listed in opposer's registration is

---

(1) When its use has been discontinued with intent not to resume such use.  Intent not to resume may be inferred from circumstances. **Nonuse for 3 consecutive years shall be prima facie evidence of abandonment.**  "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

5

considered rebutted and no evidentiary value is accorded to that registration with respect to those goods"]; Airport Canteen Services, Inc. v. Farmer's Daughter, Inc., 184 USPQ 622, 626 (TTAB 1974) [while a party may not challenge the validity of an adverse party's registration absent a petition to cancel such registration, "Board can, when there is conclusive evidence that the registered mark has not been used at time the application was filed or for a number of years thereafter on or in connection with the goods ... recited in the registration, refuse to accord any evidentiary value to the registration in determining the question of likelihood of confusion or even the question of prior rights"]; and Gates Rubber Co. v. Western Coupling Corp., 179 USPQ 186, 190 (TTAB 1973) [section 7(b) presumptions "are prima facie presumptions and are therefore rebuttable" and thus "it has been held that while a party may not challenge the validity of a registration in the absence of a petition to cancel, he may introduce evidence or rely on evidence adduced by the registrant to rebut the presumption of broad use of the registered mark and thereby to restrict use of the mark to those goods in connection with which it has actually been used," but "the evidence to be effective must be conclusive in character"].  In any event, it is additionally noted that opposer in its brief does not even mention its "WAVE/PC" mark in connection with its claim of priority of use and likelihood of confusion and, thus, plainly appears to be no longer relying thereon.

Moreover, with respect to its "WAVESYNC" mark, opposer not only likewise makes no mention thereof in its brief, but it

did not present any testimony at trial concerning the products
associated with such mark so as even to attempt to establish any
relatedness, in a commercial sense, between those goods and
applicant's goods.  Specifically, it is clear in this regard
that, on their face, opposer's "radio controllers, namely,
controllers for remotely establishing predetermined settings in
radios in rooms having occupants frequently changed, such as
hotel rooms, sold through channels including those selling to
renters of such rooms, such as hotels for the purpose of clearing
settings in radios set by occupants who have vacated the rooms"
are distinctively different from and unrelated to applicant's
"computer software for audio editing."  In view thereof, we find
that there is no likelihood of confusion from contemporaneous use
by the parties of their respective "WAVESYNC" and "GoldWave"
marks, thereby leaving consideration of opposer's "ACOUSTIC WAVE"
and "WAVE" marks and the goods associated therewith as the focus
of whether there is a likelihood of confusion with applicant's
"GoldWave" mark for its goods.

        According to the record, Mr. Carvajal is the "Category
Business Manager" for opposer's "Wave" line of products, which
consists of the following three major products:  The "Acoustic
Wave Music System," the "Wave Music System" and the "Wave Radio."
(Carvajal dep. at 7-8.)  The "Acoustic Wave Music System," which
opposer markets under the mark "ACOUSTIC WAVE," was first
marketed in 1984 and "is basically a self-contained music system"
which currently "has a CD player," "an AM/FM tuner" and "a
connection for external components."  (Id. at 9.)  Such product

7

is described in a press release issued by opposer for the latest
version thereof as "an elegant, all-in-one stereo system that
produces deep, rich base from a very small enclosure, thanks to
patented, award-winning waveguide speaker technology" that "is
based on controlled interaction of acoustical waves with a moving
surface." (Carvajal dep. Exh. 3.)  Consisting of a unit
"[m]easuring about 10 inches high (18" wide and 6" deep)," such
press release further states that the latest version of "the
Acoustic Wave music system includes a full-featured CD player,
AM/FM stereo tuner with 10 presets, and all the speaker,
amplification and equalization technology to fill a room with
sound" and "options [which] include a pedestal with inputs for
VCR, cassette deck or other music source and [a] microphone for
use as a portable public address system." (Id.)  The original
version of the "ACOUSTIC WAVE" product, Mr. Carvajal testified,
"had a tape deck on top" because, back then, "there were no CDs."
(Id. at 15.) He also noted that it was an update thereof known
as the "Series II [which] had a CD player on top" and that the
current version known as the "Series III ... added a remote
control." (Id.)

        According to Mr. Carvajal, the consumers for opposer's
"ACOUSTIC WAVE" product are "anyone who loves music." (Id. at
13.) He also maintains, in his testimony about such product,
that "[p]eople refer to it as the Wave machine, the Wave,
Acoustic Wave," although "Wave is what people know the most about
the product" due to "the Acoustic Wave Guide Technology ...
[that] makes the product possible." (Id. at 10.)  While the

8

exact sales figures for the "ACOUSTIC WAVE" product have been designated as confidential, suffice it to say that since 1984 opposer has sold over half a million units thereof, reflecting a sales volume of over half a billion dollars.[10]  Opposer sells its "ACOUSTIC WAVE" music system primarily through such consumer sales channels as its own website and catalog, its toll-free telephone number, and its factory direct retail stores, of which it has over 100 such outlets.  It also sells the product through other catalog retailers, such as consumer audio and video equipment dealers like Crutchfield and in-flight airline gift catalogs like SkyMall.  Still other sales are made through premium incentive channels in which opposer "sell[s] to large companies who use these products as ... [sales incentives for] their employees."  (Id. at 14.)

        Opposer uses print advertising, such as in magazines and newspapers, as its "biggest area" of product promotion.  (Id. at 16.)  In this regard, opposer favors publications "like U.S.A. Today, Parade where the readership is very, very large."  (Id. at 17.)  Opposer also utilizes "some broadcast advertising," such as radio ads, as well as direct mail and what it calls "single sheet inserts," which constitute "advertising that gets delivered to you in your mail."[11]  (Id.)  Opposer additionally advertises on

---

[10] It is noted, however, that instead of submitting a redacted copy of its brief in order to protect the confidentiality of its sales figures as so designated in the deposition transcript, opposer's brief sets forth such amounts, along with the amounts designated in the deposition transcript as its confidential advertising and promotional expenditures, in full.  See TBMP §801.03 (2d ed. rev. 2004).

[11] According to Mr. Carvajal, direct mail differs from single sheet inserts in that "[d]irect mail is where you have a package that you

its own website and "on what we call an affiliate website" such
as Amazon.com. (<u>Id</u>.) Other advertising includes its own full
line product catalog and third-party catalogs like the previously
mentioned Crutchfield and SkyMall, along with exhibiting at trade
shows such as the Consumer Electronics Show in Las Vegas.
Promotion of opposer's products also occurs through technical
reviews thereof published in a variety of consumer periodicals.

In his testimony, Mr. Carvajal also noted that opposer,
as an accessory item, at one time offered "the multi-media
pedestal[,] which was a product that let the Acoustic Wave Music
System be connected to multiple devices." (<u>Id</u>. at 23.) Among
other things, he testified in this regard that:

> We ... know that the most popular thing
> that people connect to our Acoustic Wave
> Music System is the television. So that
> [way] people that want to get better sound
> from their television, they connect it to
> their Acoustic Wave, and some people connect
> MP3 players. And we know people that even
> connect computers to the Acoustic Wave Music
> System to get better sound from the computer.

(<u>Id</u>.) The multi-media pedestal, he further noted, became "very,
very popular for us" following its introduction "probably in late
'90s, 1999 or something like that." (<u>Id</u>.) Opposer had such
accessory "in the market for a few years until we introduced the
CD changer" model of its "ACOUSTIC WAVE" product, which replaced
the functionality that had been offered by the multi-media
pedestal. (<u>Id</u>.)

---

send to a targeted person that we have in our database" while
"[s]ingle sheet inserts go to large lists that we buy or we obtain
[in] different ways." (Carvajal dep. at 17.)

With respect to opposer's "WAVE" radio products, Mr. Carvajal testified that the original "WAVE" radio was introduced in 1993. In 1999, opposer introduced the "Wave Radio CD," which like its original "WAVE" radio, is "basically a much smaller version of the Acoustic Wave Music System that was designed more for smaller rooms ... like bedrooms ... [and] kitchens where you maybe have trouble fitting the large product." (Id. at 29.) Stated in round numbers (due to their nominally confidential nature),[12] opposer has sold since the introduction thereof several million units of its "WAVE" radio products, including the "Wave Radio CD" model, representing a sales volume of over a billion and a half dollars. Like the initial "ACOUSTIC WAVE" music system, the original "WAVE" radio allowed a compact disc player or, as also in the case of the later CD model, a cassette recorder, to be connected thereto as an alternative source of music and both models likewise permitted a television set to be plugged in so as to improve the quality of the TV sound.

Opposer targets essentially the same kind of consumers for its "WAVE" radios as it does with respect to its "ACOUSTIC WAVE" music system products, with the difference being the price of the goods. According to Mr. Carvajal, "[t]he Acoustic Wave Music System sells for [$]1079, and the Wave Radio/CD sells for [$]499" or "about half the price" of the former. (Id. at 32.) He also testified that, in selling its "WAVE" radios, opposer "use[s] the exact same channels of trade as [for] the Acoustic Wave Music System," namely, "our website, our phones through the

---

[12] See footnote 10.

800 number, our factory direct retail stores and catalogs, [and] our premium incentive channel." (<u>Id</u>. at 32-33.)  Moreover, he added that "because the volume of sales of this product is so much higher because of the price point [differential], we do considerably more advertising on the Wave Radio and Wave CD than we do on the Acoustic Wave Music System." (<u>Id</u>. at 38.)  The various kinds of advertising, however, are basically the same, with advertising of opposer's "WAVE" radios taking place through press reviews and radio programs, broadcast advertising, catalog advertising, advertisements in newspapers and national magazines such as Parade and Sports Illustrated, other print advertising and direct mail advertising.  In fact, it appears that both opposer's "ACOUSTIC WAVE" music systems and its "WAVE" radios are frequently advertised together.  Again, while stated in round figures (due to their nominally confidential nature),[13] opposer has expended over several hundred million dollars combined in advertising both its "ACOUSTIC WAVE" music systems and its "WAVE" radios.

        Although the "Wave Radio CD" "quickly ... became the most popular product" for opposer following its introduction in 1999, opposer upgraded such product in 2004 by replacing it with its "WAVE" music system.  (<u>Id</u>. at 42.)  Among other things, opposer "added MP3 CD playback so that customers could burn MP3 CDs and play them through the Wave Music System." (<u>Id</u>.)  Its website, in advertising such product feature, specifically invites customers to "[l]isten to CDs created on your computer

---

[13] <u>Ibid</u>.

and take full advantage of the new digital MP3 format to enjoy
hours of uninterrupted Wave® music system quality sound."
(Carvajal dep. Exh. 20.)  In addition, according to Mr. Carvajal:

> The Wave Music System went to an entirely new
> platform which is all digital.  Everything is
> done in the digital domain.  So the
> equalization, the sound processing,
> everything is ... done in its software
> instructions as opposed to physical
> components.

(Carvajal dep. at 44.)  He noted, moreover, that "the development
of the Wave Music System also developed a new platform for the
Wave Radio."  (Id.)  Known as "the Wave Radio II," such product
"had the better sound and all the new features" of the Wave Music
System, with "the only difference ... [being] that the Wave Radio
[II] does not play CDs."  (Id. at 45.)  For instance, like the
"WAVE" music system, opposer's website advertises among other
things that "[a]n auxiliary jack lets you use your Wave® radio II
for lifelike sound with your iPod or MP3 player, computer, TV or
DVD player."  (Carvajal dep. Exh. 16.)

Other than applicant, which he claimed to have learned
about from opposer's counsel on the day before his testimony, Mr.
Carvajal stated on cross-examination that he was not aware of any
companies that use the word "wave" in identifying their products.
While applicant's witness, Mr. Christopher Craig, testified to a
few third-party uses of terms containing the word "wave," as well
as to technical definitions of such word, the extent of the use
of the former was not indicated and none of those uses pertains
to audio products such as loudspeakers and radios.  At best, as
to descriptive uses, the record discloses that in the computer

software field certain sound files having the extension ".wav"
are known as "wave files."

With respect to applicant, the record shows that it is
a Canadian corporation incorporated in Newfoundland and Labrador
on January 5, 2001.  Applicant is in the audio editing software
business and its president, director and principal shareholder is
Mr. Christopher Craig, who founded applicant and also develops
all the software which applicant sells under the mark "GoldWave."
Prior to applicant's incorporation, its predecessor in title to
the mark "GoldWave" was Mr. Craig, who owned such mark from its
first use on May 1, 1993 until applicant's incorporation in early
2001.  In promoting its mark, applicant does not use television,
radio or magazine ads; instead, it advertises the goods which it
sells thereunder solely on the Internet, including principally
its website.  Mr. Craig testified that he selected the mark
"GoldWave" because the word "wave" refers to the development in
the mid 1980s or thereabouts of a standard by Microsoft and IBM
for storing audio in files on a computer, which "became known as
the RIFF wave standard," and the term "gold" "often represents
quality."  (Craig dep. at 5.)

Applicant's "GoldWave" software is "a digital audio
editor" (id. at 5), which according to Mr. Craig:

> It can manipulate audio.  It's similar to a
> word processor, in some respects, where you
> can copy and paste words around.  With this
> program you can copy and paste sections of
> audio sound.  You can add special effects
> like echo and reverb and noise reduction,
> similar things like that.  But the program
> can do much more than that.  It can convert
> audio, it can restore it, it can record it,

14

> analyse [sic] it and do all the things that a
> typical audio editor wouldn't be able to do.

(<u>Id</u>. at 5-6.)  Similarly, the "GoldWave Digital Audio Editor," as
stated in the printout from applicant's "main web site," which
site also "provides a bunch of links for product purchasing or to
download the trial version or customer support" and "mentions
that the product has been in use for over 10 years with
widespread usage" (<u>id</u>. at 19), is touted as follows (emphasis in
original):

> GoldWave is a top rated, professional digital
> audio editor.  It contains so many great
> features, you will be amazed by all the
> things it can do:
>
> * Play, edit, mix and analyze audio
> * Record audio from cassettes, vinyl
>   records, radio, etc. through your
>   computer's line in
>   . . . .
> * Record and edit audio for podcasting
> * Apply special effects, such as fade,
>   equalizer, doppler, mechanize, echo,
>   reverse, flanger, and more
> * Digitally remaster and restore old
>   recordings with noise reduction and
>   pop/click filters
> * Make perfect digital copies of audio
>   CD tracks ... and save them in **wav,
>   wma, mp3** or **ogg** files
> * Edit music for dance programs, figure
>   skating, gymnastics
>   . . . .
> * Convert files to/from different
>   formats, such as **wav, wma, mp3, ogg,
>   aiff, au, vox** and even raw binary
>   data
>   . . . .
>
> GoldWave is the most advanced and complete
> audio editor available in its price range.
> It includes all of the common audio editing
> commands and effects, plus powerful built-in
> tools such as a batch processor/converter, a
> CD reader, and audio restoration filters that

> cost extra in other similar programs.
> Comprehensive, easy to use, and efficiently
> engineered, GoldWave offers the best value in
> audio editing software.  With over 10 years
> of development and widespread usage, it has
> an excellent and unmatched track record.
>
> Try the fully functional <u>evaluation version</u>
> ... of GoldWave.

(Craig dep. Exh. A-13.)

Applicant, in addition to the "GoldWave Digital Audio Editor," also presently sells the "GoldWave Voice plug-in," although details of the latter product were not provided.  (Craig dep. at 9.)  Applicant sells its "GoldWave" products "pretty much exclusively through the internet," that is, on-line, and by mail order directly from applicant; it does not sell its software in computer stores, department stores or mass merchandisers like Wal-Mart, on television shopping channels, or at trade shows.  (<u>Id</u>. at 10.)  As to the cost per unit of its "GoldWave" software, Mr. Craig testified that "[e]ach license costs $45 U.S."  (<u>Id</u>. at 26.)  Such software, however, appears to be marketed as a form of shareware in that a download for trial evaluation is free while a license is offered for other usages.  Although confidential, in terms of units thereof, the average number of downloads of "GoldWave" software on a monthly basis is in the neighborhood of roughly six figures; however, there is no indication as to the level of actual sales in general or sales in the United States in particular.  Finally, Mr. Craig also noted that applicant does not sell loudspeakers, radios or CD systems, and stated that he has never been contacted by anyone searching for opposer's products.

Opposition No. 91165449

Upon consideration of the pertinent factors set forth in In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973), for determining whether there is a likelihood of confusion herein, we find that confusion is likely inasmuch as each of such factors either favors opposer or is neutral; none favors applicant. In particular, starting with the du Pont factor of the fame of the prior marks, the evidence of record establishes that both opposer's "ACOUSTIC WAVE" mark and its "WAVE" mark are famous for their respectively associated audio products. While as shown, for instance, by opposer's registrations for its "ACOUSTIC WAVE" mark on the Supplemental Register and on the Principal Register under the provisions of Section 2(f) of the Trademark Act, as well as the fact that certain sound files having the extension ".wav" are known as "wave files," the terms "acoustic wave" for loudspeakers and "wave" for, inter alia, radios, compact stereo systems and portable compact disc players initially had only a merely descriptive significance in relation to the respective goods, such terms have through longstanding extensive use and widespread promotion thereof not only acquired distinctiveness, but the marks "ACOUSTIC WAVE" and "WAVE" have become famous in the marketplace for audio equipment.

As stated by our principal reviewing court in Bose Corp. v. QSC Audio Products Inc., 293 F.3d 1367, 63 USPQ2d 1303, 1305-06 (Fed. Cir. 2002):

> Direct evidence of fame, for example from widespread consumer polls, rarely appears in contests over likelihood of confusion. Instead, our cases teach that the

17

Opposition No. 91165449

> fame of a mark may be measured indirectly,
> among other things, by the volume of sales
> and advertising expenditures of the goods
> traveling under the mark, and by the length
> of time those indicia of commercial awareness
> have been evident.  ....
>
> ....
>
> In this case, Bose sought to prove the
> fame of its marks by reference to the volume
> of sales and advertising expenses of the
> products it sells and has sold under the
> ACOUSTIC WAVE and WAVE marks.  It also sought
> to anchor the significance of those
> commercial indicia of fame with the record
> evidence of many widely-distributed critical
> assessments of the marked products that
> greeted their arrival in the marketplace and
> continued thereafter.

Based upon its review of such evidence, the court found that:

> In this case, the sales and advertising
> numbers for ACOUSTIC WAVE and WAVE have to be
> seen both in the context of how the products
> are presented in the advertising and sales
> material (here with sufficient independence
> from the famous [BOSE] house mark) and in the
> context of the continuous and extensive
> critical consideration the marked products
> have enjoyed.  The record, described above,
> gives evidence that the consuming public has
> been exposed frequently and nationwide to
> extensive descriptions of the two products.
> In these contexts, the sales and advertising
> numbers, our historic indicia of fame, are
> bolstered by overwhelming evidence of
> confirmatory context ....
>
> When the full record is considered, only
> one conclusion can be reached regarding the
> fame of the Bose product marks:  they are
> famous and thus entitled to broad protection.

Likewise, and inasmuch as the record recounted herein contains

even more evidence of the extensive public recognition and renown

of opposer's "ACOUSTIC WAVE" and "WAVE" marks than that described

in detail in *QSC Audio Products*, supra at 63 USPQ2d 1306-07, we

are inexorably lead to the same conclusion, specifically, that
such marks are indeed famous.

Furthermore, as noted by our principal reviewing court
in Kenner Parker Toys Inc. v. Rose Art Industries Inc., 963 F.2d
350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992), *cert. denied*, 506
U.S. 862, 113 S.Ct. 181 (1992), "the fifth *duPont* factor, fame of
the prior mark, plays a dominant role in cases featuring a famous
or strong mark.  Famous or strong marks enjoy a wide latitude of
legal protection."  The Federal Circuit reiterated these
principles in Recot Inc. v. M.C. Becton, 214 F.3d 1322, 54 USPQ2d
1894, 1897 (Fed. Cir. 2000), stating that "the fifth *DuPont*
factor, fame of the prior mark, when present, plays a 'dominant'
role in the process of balancing the *DuPont* factors," *citing*,
inter alia, *Kenner Parker Toys*, supra at 22 USPQ2d 1456, and
reaffirmed that "[f]amous marks thus enjoy a wide latitude of
legal protection."  This factor, therefore, weighs heavily in
favor of opposer.

Turning next to consideration of the similarity or
dissimilarity of the respective marks in their entireties as to
appearance, sound, connotation and commercial impression, we find
that this *du Pont* factor also favors opposer.  Here, due to the
shared presence of the word "wave," applicant's "GoldWave" mark
incorporates the entirety of opposer's famous "WAVE" mark and a
significant portion of its famous "ACOUSTIC WAVE" mark (which
according to the record consumers sometimes shorten to just
"WAVE"), thereby creating a substantial similarity between the
respective marks, especially in view of the suggestiveness

inherent in the terms "gold" and "acoustic."  As analogously
stated by our principal reviewing court in *QSC Audio Products*,
<u>supra</u> at 63 USPQ2d 1311, in finding the mark "POWERWAVE" for
amplifiers and power amplifiers confusingly similar to the mark
"WAVE" for, *inter alia*, "radios, clock radios, compact stereo
systems and portable compact disc players" and the mark "ACOUSTIC
WAVE" for loudspeaker systems and music systems consisting of a
loudspeaker system, an amplifier and a radio tuner and/or compact
disc player:

> The presence of the root element WAVE
> ... introduces a strong similarity in all
> three marks.  Whatever additional distinction
> may be introduced by the element of POWER in
> the ... POWERWAVE mark is severely limited by
> the fact that the mark is applied to acoustic
> equipment, namely amplifiers.  For this
> reason, the overall commercial impression
> engendered by the use of the POWERWAVE mark
> also carries a strong connotation of sound
> waves, corresponding to the Board's findings
> with respect to ACOUSTIC WAVE and WAVE.  Any
> examination of the record before the Board
> reveals that the "wave" portion of the Bose
> marks refers to sound and the unique way in
> which it is manipulated in the Bose products
> to produce the end product, sound.  "Wave"
> thus has meaning, and in this instance the
> newcomer, QSC, seeks to nestle close to the
> fame-benefited Bose marks.
>
> ....
>
> On the record before us, we conclude
> that a proper evaluation of the similarities
> of the QSC and Bose marks in their entireties
> weighs in favor of a finding of a likelihood
> of confusion.

The same is likewise true in this case.  While the term
"gold" adds a laudatory element to applicant's "GoldWave" mark
which is absent from opposer's "WAVE" and "ACOUSTIC WAVE" marks,
such a difference is nonetheless severely limited by the fact

20

that applicant's mark is applied to "computer software for audio editing," a product which the record shows can edit, among other things, wave files or sound recordings for transfer to and playback from CDs or compact discs. In view thereof, the overall commercial impression engendered by use of the "GoldWave" mark also carries a strong connotation of sound waves, corresponding to the sound waves suggested by the term "wave" in connection with the sound reproduction products marketed under opposer's "ACOUSTIC WAVE" and "WAVE" marks, including the unique way in which such products manipulate sound waves to produce the end result of high fidelity sound. The word "wave" thus has meaning, in terms of its audio or sound significance, in relation to both applicant's product as well as opposer's goods. In consequence thereof, the marks at issue herein are so substantially similar in overall sound, appearance, connotation and commercial impression that, if used in connection with the same or related goods, confusion as to the source or sponsorship of such products would be likely to occur. The factor of the similarity between the parties' marks accordingly favors opposer.

With respect to the *du Pont* factor of the similarity or dissimilarity and nature of the goods as described in the opposed application or in connection with which a prior mark is in use, it is well settled that the goods at issue in a proceeding such as this need not be identical or directly competitive in order for there to be a likelihood of confusion. It is sufficient, instead, that the goods at issue are related in some manner and/or that the circumstances surrounding their marketing are

such that they would be likely to be encountered by the same

persons under situations that would give rise, because of the

marks employed in connection therewith, to the mistaken belief

that they originate from or are in some way associated with the

same producer or provider. See, e.g., In re Martin's Famous

Pastry Shoppe, Inc., 748 F.2d 156, 223 USPQ 1289, 1290 (Fed. Cir.

1984); Dan Robbins & Associates, Inc. v. Questor Corp., 599 F.2d

1009, 202 USPQ 100, 104 (CCPA 1979) ["marks need not be used on

directly competing goods, any relation likely to lead purchasers

into assuming a common source being sufficient"]; Monsanto Co. v.

Enviro-Chem Corp., 199 USPQ 590, 595-96 (TTAB 1978); In re

International Telephone & Telegraph Corp., 197 USPQ 910, 911

(TTAB 1978).

        In this case, while opposer's goods are audio products

used for reproducing sound and applicant's product is computer

software for audio editing, the respective goods are nevertheless

related in that the record confirms that they are complementary

products used in connection with listening to sound, such as

music.  The record makes clear that both opposer's "ACOUSTIC

WAVE" music system and its "WAVE" radio are marketed in versions

which can play CDs or compact discs.  Although applicant's

product does not play compact discs or reproduce sound for

listening, its computer software for audio editing allows for

music or other sound files, including wave files or MP3 format

files, to be collected, manipulated further (if desired) for

audio effects and, through the use of a CD burner, copied to a

compact disc, which can then be played in opposer's goods in

order for the listener to enjoy the assertedly better sound reproduction quality provided by such goods. Moreover, through the use of a pedestal accessory or an auxiliary jack, opposer's "ACOUSTIC WAVE" music systems and its "WAVE" radios and music systems allow a computer to be connected thereto for more lifelike sound from the audio files created and/or stored on a computer through, for instance, the use of applicant's audio editing software, which among other things allows audio from cassettes, vinyl records and the radio to be converted to files playable directly from the computer. Plainly, in view thereof, applicant's product and opposer's goods are similar in that they are related, complementary products. The *du Pont* factor of the similarity or dissimilarity and nature of the goods therefore favors opposer.

Furthermore, the associated *du Pont* factor of the similarity or dissimilarity of established, likely-to-continue trade channels also favors opposer. In particular, with respect to the Internet, opposer advertises and offers its "ACOUSTIC WAVE" and "WAVE audio products at its website, while applicant likewise does the same with respect to its "GoldWave" computer software for audio editing, which is available for trial use or purchase from its website as well as certain third-party websites.

Of the relevant *du Pont* factors which remain, such are at best neutral and none favors applicant. In particular, as to the number and nature of similar marks in use on similar goods, opposer's witness testified that he was not aware of any

companies (other than applicant) that use the word "wave" in
identifying their products, while applicant's witness testified
to only a few third-party uses of terms containing the word
"wave." However, as previously noted, the extent of such use was
not indicated and none of the third-party uses identified
pertains to audio products such as loudspeakers, radios or the
like.

　　　　　Furthermore, as to the *du Pont* factor of the length of
time during and conditions under which there has been
contemporaneous use without evidence of actual confusion,
applicant stressed at oral hearing that the record shows that
there have been no reported incidents of actual confusion during
a period of approximately 14 years of contemporaneous use by the
parties of the marks at issue. While it is the case that the
absence of any instances of actual confusion over a significant
period of time may be indicative of no likelihood of confusion,
such an absence is meaningful only where the record demonstrates
appreciable and continuous use by the defendant of its mark in
the same market(s) as those served by the plaintiff under its
mark. See, e.g., Gillette Canada Inc. v. Ranir Corp., 23 USPQ2d
1768, 1774 (TTAB 1992); and Chemetron Corp. v. Morris Coupling &
Clamp Co., 203 USPQ 537, 541 (TTAB 1979). Moreover, and in
particular, there must be evidence showing that there has been an
opportunity for incidents of actual confusion to occur. See,
e.g., Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d
1842, 1847 (Fed. Cir. 2000).

Here, however, the evidence relating to use establishes that, in the case of applicant's "GoldWave" computer software for audio editing, such product is available as a trial version which potential buyers of a license to use the full-featured version can download and use for free.  Thus, although the average number of units of "GoldWave" software downloaded on a monthly basis, which as noted previously is in the neighborhood of around six figures according to the most recent confidential information furnished by Mr. Craig, would seem to be substantial, there is no indication as to the percentage of free downloads or level of licensed sales *in the United States*.  Moreover, even assuming that most of the downloads of applicant's software are by trial users thereof in the United States and thus involve no licensing fee, if those trial users of the free version of applicant's "GoldWave" audio editing computer software were, for instance, to become dissatisfied with the fact or otherwise learn that opposer was not the source of applicant's product as they had assumed when deciding to try such product or while using it, it seems that they would be unlikely to complain, either to applicant or opposer, inasmuch as the cost of their use thereof was nothing. The absence, therefore, of any reported incidents of actual confusion is of little probative value in this case and does not serve as a mitigating factor which favors applicant.  See, e.g., Beer Nuts, Inc. v. Clover Club Foods Co., 805 F.2d 920, 231 USPQ 913, 918 (10th Cir. 1986) [evidence of absence of incidents of actual confusion "does *not* necessarily support a finding of *no* likelihood of confusion, especially when the products involved

are inexpensive" because "[p]urchasers are unlikely to bother to inform the trademark owner when they are confused about an inexpensive product" (italics in original)]; Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366, 188 USPQ 623, 639 (7th Cir. 1976) ["when products ... are low value items ... purchasers are unlikely to complain when dissatisfied"]; and In re Azteca Restaurant Enterprises Inc., 50 USPQ2d 1209, 1212 (TTAB 1999) ["given the relatively inexpensive nature of the menu items at applicant's restaurants, and the obviously inexpensive nature of registrant's [Mexican] food products, we wonder if purchasers would even be aware of their confusion, and if they were, whether they would take the trouble to inform either of the trademark owners"].

In view of the above, we conclude that contemporaneous use by applicant of the mark "GoldWave" in connection with its "computer software for audio editing" is likely to cause confusion with opposer's use of the substantially similar marks "ACOUSTIC WAVE" for "loudspeaker systems and music systems consisting of a loudspeaker system and amplifier and at least one of a radio tuner, compact disc player and audio tape player" and "WAVE" for, *inter alia*, "radios, clock radios, ... compact stereo systems and portable compact disc players."

Decision: The opposition is sustained and registration to applicant is refused.

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| GoldWave Inc. | Bose Corp. |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF | 99999 | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT |
|---|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | | (IN U.S. PLAINTIFF CASES ONLY) |
| | | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Marsha G. Gentner<br>Philip L. O'Neill<br>JACOBSON HOLMAN PLLC<br>400 Seventh Street, N.W.<br>Washington, D.C. 20004-2201 | Charles Hieken<br>Amy L. Brosius<br>FISH & RICHARDSON P.C.<br>225 Franklin Street<br>Boston, MA 02110-2804 |

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

◉ 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX

FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

◉ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**     OR     ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

15 U.S.C. 1071(b) - review of TTAB, USPTO Decision in Opposition No. 91165449

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ _____ | Check YES only if demanded in complaint |
|---|---|---|---|
| | | JURY DEMAND: | YES ☐  NO ☒ |

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE  April 25, 2008    SIGNATURE OF ATTORNEY OF RECORD  _(signature)_

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

**VI.**  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.